IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
— — —

| | |
|---|---|
| IN RE: | : Civil Docket 23-CV-2288 |
| | : |
| ONIX GROUP, LLC | : |
| DATA BREACH LITIGATION | : Settlement Hearing |

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
May 15, 2024 at 2:30 p.m.

BEFORE THE HONORABLE KAREN SPENCER MARSTON

APPEARANCES:

FOR THE PLAINTIFFS:    BENJAMIN F. JOHNS, ESQUIRE
                       SAMANTHA E. HOLBROOK, ESQUIRE
                       Shub & Johns, LLC
                       Four Tower Bridge
                       200 Barr Harbor Drive
                       Conshohocken, PA 19428
                       Bjohns@shublawyers.com
                       Sholbrook@shublawyers.com


FOR THE DEFENDANTS:    EDWARD J. MCANDREW, ESQUIRE
                       NATHALIE FREEMAN, ESQUIRE
                       Baker & Hostetler, LLP
                       1735 Market Street
                       Philadelphia, PA 19103
                       Emcandrew@bakerlaw.com
                       Nfreeman@bakerlaw.com


— — —

Bobbie J. Shanfelder, RDR, CRR
Official Court Reporter
Bobbie_Shanfelder@paed.uscourts.gov

1   (Wednesday, May 15, 2024 at 2:30 p.m.)

2            MR. JOHNS:  On behalf of Plaintiffs, Ben Johns from the

3   Shub and Johns law firm.

4            MS. HOLBROOK:  Good afternoon, Your Honor.  Samantha

5   Holbrook also on behalf of the Plaintiffs with Shub and Johns.

6            MR. MCANDREW:  Good afternoon, Your Honor.  Edward

7   McAndrew and Nathalie Freeman on behalf of the Defendants Onix.

8            THE COURT:  Great to have you.  So I guess it's an

9   unopposed motion, but I will hear from you on the motion.  I do

10   have some questions.  Why don't you go ahead.

11            MR. JOHNS:  Sure, Your Honor.  Good afternoon again,

12   Your Honor.  May it please the Court?  Ben Johns on behalf of the

13   Plaintiffs.  There is, as you correctly noted, an unopposed

14   motion for preliminary approval that's pending.  I'm prepared to

15   go into as much or as little detail with respect to that motion

16   as the Court would like.  I think as just a general overview, I

17   will sort of hit the highlights.  I think there is really three

18   issues for the Court to decide.

19            The first is whether the proposed settlement is fair,

20   reasonable, and adequate under the Girsh factors and under Rule

21   23(e).  I won't repeat all the points that we make in our brief,

22   but we do believe that this is a very good settlement.

23            It was, as we pointed out in our brief, negotiated with

24   the assistance of mediator Ben Picker from the Stradley Ronon Law

25   Firm.  He's one of the foremost data breach mediators in the

1    United States, not just here in Philadelphia.

2            The case had significant risks.  We go through those in

3    our brief.  I will also note that one of the risks we talk about

4    is the risks associated with class certification.  And there was

5    just an opinion issued yesterday in the District of South

6    Carolina called In Re: Blackbaud that denied class certification

7    in a data breach after three days worth of Daubert hearings and

8    arguments.

9            THE COURT:  What Judge?

10           MR. JOHNS:  The name of the Judge?  I have the opinion.

11           THE COURT:  Let's see it.

12           MR. JOHNS:  Judge Joseph F. Anderson, Jr.  Docket

13   Number 20-2972.

14           THE COURT:  Great.  Thank you.

15           MR. JOHNS:  So there were other risks associated with

16   this case, including the composition of the class.  A large

17   portion of this class were people who were deceased.  That raised

18   some issues.

19           THE COURT:  I am confused by that because, yes, your

20   class definition totally talks about that.  But then when we get

21   to the notice and stuff, are we just assuming a natural person

22   doesn't include deceased person?  Is that why we are using that

23   term?  And what is the consequence there?

24           MR. JOHNS:  Sure.  So what we did, Your Honor, there

25   was a broader class.  I think it was 390,000 people that

1    initially got the notice.  It turns out, I think, approximately

2    21 percent of that class was deceased.  And so what we did when

3    we settled it is the way we came up with this number of class

4    members of 308,000 was people who were not confirmed deceased.

5    They are not included in the class.  They are not entitled to

6    make a claim.  They are not releasing any claims.

7                THE COURT:  Okay.

8                MR. JOHNS:  So --

9                THE COURT:  The deceased people.

10                MR. JOHNS:  Correct, Your Honor.  Confirmed deceased.

11    I guess, theoretically, if someone's estate was out there and

12    backed by this, they could theoretically file a claim.  That's

13    right, Judge.  So as far as the other risk, I will just mention.

14    I won't go through everything.  But Mr. McAndrew made an argument

15    about whether or not this information that was compromised was

16    ever actually viewed.  Obviously that's something we would have

17    to litigate, but we do acknowledge that's a risk.

18                With respect to the attorneys' fees, obviously, we are

19    not here for that today.  But one thing I will point out -- well,

20    actually two things I will point out.  Number one, the one-third

21    amount that we will be requesting is consistent with what has

22    been approved in other cases.

23                And the other point that I will note is there's not

24    what's called clear-sailing provision in that settlement

25    agreement.  Mr. McAndrew has the right to file an objection to it

1    or respond to it.  And that's something, having argued this in

2    the Third Circuit and actually about to go back up to the Third

3    Circuit in another case, is important.  So we headed that off in

4    the settlement agreement.  So we think it meets the standard

5    under Girsh and Rule 23(e).

6            The second issue before the Court is whether to grant

7    certification of the class for settlement purposes.  I will just

8    hit off some of the highlights there.  Numerosity easily met.

9    That standard is typically 40 people.  We are over 300,000.

10   Commonality and predominance.  I think we can look at those

11   together.

12           Really the core issues in this case, from our

13   perspective, focus on the Defendant's conduct; whether the

14   Defendant had a duty; whether the Defendant breached a duty,

15   things of that nature.  These are all common factual and legal

16   questions.

17           Typicality.  Plaintiffs in the class members are

18   asserting the same types of claims for the same event, the data

19   breach.  Ascertainability was another issue that the Third

20   Circuit has imposed in class certification.  That's easily met

21   here, too, inasmuch as we are sending the notice to the list that

22   the Defendant maintains.

23           Adequacy of counsel.  We have seven Plaintiffs who

24   stepped forward and --

25           THE COURT:  Why so many?

1          MR. JOHNS:  Well, for a number of reasons.  One, Your

2     Honor, let me just, first of all, tell you when we filed the

3     amended complaint, we thoroughly vetted all of these people.  We

4     interviewed them and asked a bunch of questions.  But to answer

5     your question, Your Honor, one of the things that we wanted to do

6     was make sure we had representatives from different states.  We

7     wanted to make sure we had people who alleged to have -- multiple

8     people that alleged they had fraud as a result of the breach.

9          And the reason for that is if Mr. McAndrew made an

10    argument, probably on summary judgment, about someone having

11    fraud but not being connected, having more Plaintiffs that were

12    on the complaint give us a fallback, for lack of a better phrase,

13    gives us more people to make that argument.

14         THE COURT:  All right.  So the consolidated complaint

15    includes allegations of Plaintiff that did not initially file a

16    complaint.

17         MR. JOHNS:  That's right, Judge.

18         THE COURT:  That's somebody you vetted, this Mark

19    person?

20         MR. JOHNS:  Yes, Your Honor.

21         THE COURT:  But then Ashlea Bernard's complaint was not

22    included in the consolidated complaint?

23         MR. JOHNS:  I don't have the names or the match up but

24    I can tell you as a general matter that that's what happened.

25    There are some Plaintiffs that have filed that were on complaints

1    and did not make the cut and did not appear on the amended

2    complaint.  That's right, Your Honor.

3              THE COURT:  So how did each one of these -- did every

4    class representative assist in the same level and degree?

5              MR. JOHNS:  Yeah.  We had them -- there was a

6    questionnaire that my colleague Ms. Holbrook created and filled

7    out.  And we had, I think, every single call with these folks,

8    both a paralegal and a lawyer on it to ask questions, not only

9    about the alleged fraud they have experienced in this case but

10   also questions about other cases they have been involved in, the

11   likelihood that if we had to do depositions that they were going

12   to appear, that they were going to participate in discovery.  And

13   so the group of seven people that we ultimately selected checked

14   all those boxes.

15             THE COURT:  All right.  Your consolidated complaint

16   included Pennsylvania, New Jersey, Virginia subclasses based on

17   allegations of state consumer protection laws.  So we are not

18   seeking to certify any subclasses; right?

19             MR. JOHNS:  No.  We are seeking, again, for settlement

20   purposes, we are seeking to certify a nationwide class to get

21   that released.  What would have happened, if this played out in

22   the litigation context, getting a nationwide class certified if

23   you don't have Federal statute or a choice-of-law provision in a

24   contract applicable is really tough.  Generally, it's the home

25   state laws that apply.

1            And so that's why, as I was saying earlier, that's why

2    we wanted to get representatives from those three states.  So we

3    submit that the Rule 23(a) adequacy requirement was satisfied

4    with respect to those seven Plaintiffs.

5            We also respectfully submit, Your Honor, that adequacy

6    is satisfied with respect to lead counsel.  So I think unless you

7    have any questions for me on the Rule 23 class certification

8    analysis, I will move on to the third and final issue and that is

9    the notice plan.

10           We hired Angeion through a competitive bidding process.

11   Angeion is a nationally-reputable claims administration firm.  We

12   have proposed -- and this is all in the record.  But the

13   settlement notice, there's going to be a settlement website.

14   There's going to be a toll-free number.

15           I anticipate from experience in these cases we are

16   going to, as the lawyers will be getting a lot of calls, too, we

17   also, I will note, it was important to us, particularly given the

18   nature of this case, to put in front of the Court something to

19   satisfy the Court hopefully that Angeion has security measures in

20   place because we do care about this information that's going to

21   be transmitted from the Defendant to Angeion.  That's the reason

22   why we had that.  That's in the record, too, with the Angeion

23   submission.

24           One other note related to notice that I will point out

25   is the CAFA notice, the Class Action Fairness Act notice.  I've

1    confirmed that that was sent out on March 1st to the various

2    Attorneys General and Federal officials.  So that's already been

3    taken care of.

4              So for all those reasons, Your Honor, we respectfully

5    submit that the settlement should be preliminarily approved.  And

6    one thing I didn't mention is it's also consistent with other

7    cases that have essentially the same structure, different numbers

8    but same framework.  Judge Wolson's opinion in Connexin will be

9    put in the record as supplemental authority.

10             Ms. Holbrook and I have another case in Michigan next

11   week where we have final approval, a case against Hope College.

12   That's, again, the same structure.  And I can list some more

13   cases if the Court is interested.  But unless you have any

14   questions, I think I will rest at this point.

15             THE COURT:  I do have questions.  And I actually I

16   think the notice needs to be a little clearer because you really

17   are -- the way this works is if the first thing everybody is

18   going to go to -- well, the way the notice looks, you have to say

19   yes or no whether you want a payment.  And I think most people

20   will say yeah, I want payment.  And they don't read the next two

21   things.  But those people are the least likely to get a payment

22   because, first, all this net settlement fund is first going to go

23   to the credit monitoring; right?

24             MR. JOHNS:  Yes.

25             THE COURT:  And they may not have enough to do that;

1    right?

2             MR. JOHNS:  Well, frankly --

3             THE COURT:  Talk about that because that's what I

4    noticed here.  Tell me.  Is it going to be enough?

5             MR. JOHNS:  Yes.  And the reason -- well, let me sort

6    of say two things on that.  Number one, I can tell you from this

7    case in particular, one of the things we learned during the

8    mediation was Onix sent out notice to the class members.  And

9    they offered a year of credit monitoring.  And the response rate

10   from that was very, very low.  It was like 1,756 people which

11   translates to less than -- it's like 0.4 percent.

12            So anyway, the point of that is -- and this is the

13   reason we structured the settlement the way we did.  The number

14   of people that will want credit monitoring as opposed to cash

15   will be very low, I expect.

16            And I also expect that the number of people that submit

17   documented loss claims is going to be very low.  And I can tell

18   you that because of these cases I just mentioned, the Keystone

19   case, for example, that was I did final approval for that in

20   Chambersburg last summer.  I think it was 88 percent of the class

21   of the same structure; 88 percent of the class members wanted the

22   cash.

23            And the other thing I will note, a lot of the claims we

24   see for the documented losses, a lot of times those are

25   fraudulent.  And that's the claims administrator will review

1    those.  But the point is, again, those two components, the

2    monitoring and the documented losses, highly, highly, highly

3    unlikely that will deplete the fund.

4                THE COURT:  Especially on that small notice.  The "or"

5    has to be bold and bigger.  That postcard is going to be almost

6    impossible to read.

7                MR. JOHNS:  Understood, Your Honor.  We will make that

8    change.

9                THE COURT:  That's one thing.  And then I sort of think

10   that the order should follow the order of how it's getting paid

11   out of the net settlement.  So wherever you talk about the three

12   things, we ought to start.  And it needs to be clear that the

13   money first is going to go to this credit monitoring.

14               As long as there's enough money left, it goes to the

15   documented losses.  And as long as there's enough money left, it

16   will go pro-rata to everybody.  Based on your experience in other

17   cases, how much is a person going to potentially get?

18               MR. JOHNS:  In this case?  I actually anticipated this

19   question.  So I guess as a preliminary matter, Your Honor, the

20   question involves two assumptions.  Assumption number one is

21   what's the overall claims rate.  The second assumption is how the

22   claims that are filed will be allocated between the three

23   buckets.

24               So here is the way this works.  At the top, that's the

25   class size.  You have what I will call the top line deductions.

1    Attorneys' fees, expenses.  And these are estimates.  Obviously I

2    am assuming everything is approved.  But once all that is taken

3    out, you have this $547,000.  So what I did here was made three

4    assumptions that are identical except for the claims rate which

5    is highlighted.  It's a little bit hard to read but --

6            THE COURT:  Why is total expenses in a box?

7            MR. JOHNS:  I just did that.  I did that in Excel.  It

8    was easier for me to read.  I wanted to make it look nice for the

9    Court.

10            THE COURT:  Basically you subtract all of those numbers

11    to get the 547.

12            MR. JOHNS:  Right.  We start with the 1.25 million.

13    That's what we have here to work with.  You add the expenses.

14    Again, the top line expenses.  Those expenses add up to 702.  And

15    when you subtract the 702 from the 1.25 --

16            THE COURT:  Oh, I understand now what you are doing.

17            MR. JOHNS:  So you have the net fund and then from the

18    net fund that's where I did these three different scenarios; one

19    with 3 percent; one with 2 percent; and one with 1 percent.  As

20    you can see, depending on what the claims rate is, it could be

21    anywhere from $62 to $191.

22            THE COURT:  I see.

23            MR. JOHNS:  I am happy to walk through.

24            THE COURT:  No, no.  All right.  Makes sense.  I note

25    that the parties have agreed as part of this settlement that for

a period of 2 years from the effective date, Onix will adopt,
continue, and/or influence certain data security and privacy
improvements.  Why the 2 years?  I think if we are making
improvements, why not keep those improvements in place?

MR. JOHNS:  I would think the same thing, Judge
Marston, but the reason we agreed, aside from this being a
negotiated term, is because it's a negotiated term, it's a term
of the settlement agreement.

So theoretically -- and I don't think they would do
this.  Let's say they decided to stop doing these improvements
after a year.  We could come back to you and say, Your Honor,
they breached the settlement agreement.

So I think the short answer is, it didn't really make
sense as a practical reason to say, okay, in the settlement
agreement, this is going to be for 10 years or indefinite.  And I
will tell you as well, that's pretty standard for these types of
settlement agreements.

MR. MCANDREW:  I am happy to address that as well.

THE COURT:  Where is it in the settlement agreement?

MR. JOHNS:  Section 2, Judge.  And it's pretty -- I
will acknowledge, the way it is in the settlement agreement, it's
fairly general.

THE COURT:  It doesn't tell you 2 years.

MR. JOHNS:  Oh, it doesn't say 2 years?

THE COURT:  No.  I think it should.

1    MR. JOHNS:  I think you are right.

2    THE COURT:  I think the 2 years should be in there.

3    MR. JOHNS:  That's easy enough.

4    THE COURT:  To the extent I don't think that's in the

5    notice.  Is it in the notice?  Might be in the long form.  I

6    don't think it says 2 years in the long form.

7    MR. JOHNS:  I don't know the answer off the top of my

8    head, but we will amend the settlement agreement and make sure

9    it's in the long form notice.

10    THE COURT:  So, for instance, your settlement agreement

11    at 3.3.  I think we need to -- in the settlement agreement, can't

12    we put it in the order of how you guys are going to -- let's make

13    it link it up.  Where it starts with the credit monitoring and

14    insurance first.  So B should be A, and A should be B.

15    MR. JOHNS:  You mean in the ordering?

16    THE COURT:  Right.  Otherwise you read the settlement

17    agreement and you think documented loss and then you get to the

18    credit.  And none of this even makes sense until you really

19    realize that the "or"s are involved here.  The way I read this,

20    when I first read it, it was like, all right, you are getting

21    documented loss and also credit monitoring on top.  But you are

22    not.  So it needs to be clear.

23    MR. JOHNS:  We will do that.

24    THE COURT:  On the notice, I want it in the correct

25    order.  And I want "or"s to be bold and italicized.  Maybe even a

1    font size bigger.  To the extent that that's also needed in the

2    long form, make sure it's in the long form, too.

3              MR. JOHNS:  Understood, Your Honor.

4              THE COURT:  Let me understand on this short notice, the

5    idea is that you are going to mail out this card.  I am looking

6    on your pdf, and I am on Page 77.  The way, I mean, it's hard for

7    me to visualize.  Is it one of these cards that you open?

8              MR. JOHNS:  Yes.  Two pages.  And this is addressed in

9    the Angeion declaration.  It's what's called a tear-off return.

10   And it will have postage prepaid claim form that people can fill

11   out quickly, send it in.

12             THE COURT:  Look at this one.  Onix settlement claim

13   form for pro-rata cash payment only.  To me, that's if you elect

14   that; right?

15             MR. JOHNS:  Right.

16             THE COURT:  But then it talks about -- to me, this

17   doesn't make sense because pro-rata cash fund payment.  Would you

18   like to receive cash payment of the settlement?  Of course I

19   would.  I will hit yes, and then I am done.  But I don't realize

20   I am done because if I read the documented losses and the credit

21   monitoring and I don't realize I am also not going to get that.

22             MR. JOHNS:  I see what you are saying, Your Honor.  We

23   can put some clear, what I will call, stop sign signals.

24             THE COURT:  Yeah, like a verdict form.  If you say yes

25   to this, do not go on.  This has got to be clearer, this page.

1      It's not clear to me.  And it's hard enough to read it as it is

2      because it's so small.  But we have to make sure people

3      understand there's going to be three choices.  They might read

4      that page first and not get to your next page.

5              The next page is where I want the "or"s to be bigger

6      and bold.  You must exclude yourself.  Okay.  You must exclude

7      yourself.  I think we should bold, if you do not want to be

8      legally bound by this settlement, you must exclude yourself by

9      whatever date.  I think that should all be bold.

10             MR. JOHNS:  Okay.

11             THE COURT:  What's up with this sole discretion to

12     direct the settlement administrator if it's less than 3 percent?

13             MR. JOHNS:  The idea there was we wanted to have, I

14     think, in my mind, at least, there would be a difference if the

15     claims were 2.9 percent versus .0001 percent.  And obviously

16     there's a cost associated with renoticing, so we just wanted to

17     give ourselves some flexibility there.

18             THE COURT:  But they are going to send it out 10 days

19     ahead of time.

20             MR. JOHNS:  Yes.

21             THE COURT:  That's calculated into it?

22             MR. JOHNS:  Yes.

23             THE COURT:  So your expenses here, does that include

24     the cost of 30 day?

25             MR. JOHNS:  I believe so.

1          THE COURT:  Expenses might go down a little bit for

2     those that timely read their mail and don't throw it out.  And

3     this is going to lead you also to a website.  But the only -- to

4     do the documented losses and to do the credit monitoring, you

5     have to go to the website; right?  I read somewhere that you have

6     to go to the website for something.

7          MS. HOLBROOK:  Yes, for the documented losses because

8     you have to provide more information.  So that's why it's not as

9     easy to just check the box on the claim form.  So you are right.

10    You have to go to the website to complete the claim form if you

11    are claiming reimbursement for the documented losses.  Because

12    there's a proof requirement attached to that which is not

13    required but -- you can print out the claim form and mail it in.

14    But it's not on the postcard.

15         THE COURT:  Right.  You can't circle here and document

16    I want documented loss.

17         MS. HOLBROOK:  You have to submit the substantiating

18    proof.

19         THE COURT:  I think you guys have to work on the first

20    page of this notice because it is confusing.  Then they certify

21    as to the pro-rata class.  And I think a lot of the members of

22    the public are going to think really the only thing that maybe

23    the other two things -- I don't think they are going to

24    understand.  I think they are going to read this page, hit yes,

25    and sign.  And they are not going to realize that they are not

1    getting credit monitoring.  Whatever Onix gave is probably

2    already done; right?  If you opted for it?

3           MR. MCANDREW:  On the original credit monitoring, yes.

4    Yes, Your Honor.

5           THE COURT:  And this you have to activate 180 days.

6           MR. JOHNS:  I think you have a year to activate it.

7           MR. MCANDREW:  Within the year.

8           THE COURT:  How did you determine who is dead?

9           MR. MCANDREW:  A number of ways.  We hired Kroll and

10   they did it through death certificates, public records, public

11   death notices.  Anything they could find publicly.  In our own

12   mailing process where we do the notification, the instant, we

13   received a number of those letters back saying this person is

14   dead.  So we were able to --

15          THE COURT:  That's interesting.  People took the time

16   to do that?

17          MR. MCANDREW:  The post office would let us know.

18   There were different ways we would find that out.  But basically

19   we ended up with about 21 percent who were confirmed dead.  And

20   we know that another 17 percent, if they are still alive and

21   these folks are in the business of long-term nursing care,

22   methadone clinics, drug rehab clinics.  They are not likely

23   alive.  They would be over 90 years old if they are still alive.

24   So the number of likely dead, just over 90 or confirmed, is about

25   38 percent.  That's another thing to keep in mind when we talk

1      about whether credit monitoring will likely exhaust the fund.

2               THE COURT:  No, no.  I understand what you are saying

3      now.  All right.  I don't think I have any other questions.

4      Where did the number, I guess, somehow you know your data breach,

5      the original number.  How did you get that?

6               MR. MCANDREW:  Well, in some instances, you actually go

7      through and mine the data and figure out whose personal

8      information was involved, tally it up, and notify them.  They

9      just notified everybody in their patient database.  So they took

10     the broadest possible and notified everybody.  For purposes of

11     the settlement, we are doing the same.  We are going to notify

12     everyone who we believe --

13              THE COURT:  But if you went to trial, it would be

14     different.

15              MR. MCANDREW:  Correct.  It would be very different.

16     We think that, honestly, if folks are alive and can benefit,

17     great.  This is a common fund.  Onix is writing a check.  They

18     are not getting any money back.  So the idea is going to be that

19     whatever is left to pay claimants is going to be divided up among

20     the claimants.

21              THE COURT:  Who did your cyber attack?  Do you know?

22              MR. MCANDREW:  A group called CACTUS ransomware.  They

23     are one of the cyber extortion gangs that are out there right

24     now.  We did about 1,500 instances last year in our firm alone.

25     I think upwards of 40 percent of those were cyber extortion.

1          THE COURT:  It's absolutely horrible.  I felt like you

2   addressed this but if you will do me the benefit of talking about

3   the risk of establishing liability and damages in this case.

4   That's when you referenced the South Carolina case; right?

5          MR. JOHNS:  Yes.  And the South Carolina case was a

6   class certification.  But as far as risks --

7          THE COURT:  It was the fraud.  You have to show that

8   somehow it was -- that there was injury here.

9          MR. JOHNS:  There's a causation issue here.  That's

10  right, Your Honor.  There are three issues as far as standing

11  that we see that a lot in these cases.  Under the consumer

12  protection statutes, there are various arguments there.  And

13  look, we recognize this isn't a case where we briefed a motion to

14  dismiss, but defense counsel, when we went --

15          THE COURT:  Thankfully.

16          MR. JOHNS:  Well, let me finish.  When we went to

17  mediation, we got their mediation statement was like 29 pages,

18  single space.  And I'm sure it would have exceeded Your Honor's

19  page limits if they filed that as a brief.  But in any event, and

20  maybe Mr. McAndrew is better situated to talk about his defenses,

21  but there are Article 3 arguments.  There's various causation

22  arguments.  There's damages arguments.  Even if we establish a

23  breach of a contract, for example, what are the damages for that?

24  So I think I won't go --

25          THE COURT:  You don't want to talk him out of it, do

```
1    you?  All right.  Thank you.

2            MR. JOHNS:  Thank you, Your Honor.

3            THE COURT:  Do you have anything to add that you would

4    like to add?

5            MR. MCANDREW:  The other issue, Your Honor, that's an

6    interesting one because we are doing these all the time is what's

7    the standard?  What's the cyber security standard for

8    organizations?  Do they have to crime proof their systems?

9            THE COURT:  I don't think you can.

10           MR. MCANDREW:  What's reasonable?  So there are a lot

11   of issues.  They are uncharted.  Courts are dealing with a lot of

12   these cases on motions to dismiss at the pleading stage where

13   obviously we are taking the alleged plausibly pled facts as true.

14           And then we get into all the other issues that my

15   colleague has mentioned.  So they are complex cases.  Injuries

16   are, in our view, uncertain as to actuality or imminence.  And if

17   there are injuries, then you have the valuation of those injuries

18   which is also --

19           THE COURT:  Appreciate that.  All right.  I don't have

20   any other questions.  If you guys feel like you have addressed

21   everything?  So file it and work on this.  File an amended notice

22   and update the settlement agreement to be consistent with how

23   your net settlement fund is going to go.

24           MR. JOHNS:  Understood.  We will.

25           THE COURT:  And then we will get this out.  All right?
```

1    Thank you.  Thank you all.

2              MR. JOHNS:  Thank you, Your Honor.

3              MR. MCANDREW:  Thank you, Your Honor.

4              (The hearing concluded at 3:01 p.m.)

5

6

7

8                     C E R T I F I C A T I O N

9

10             I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    /s/ Bobbie J. Shanfelder

14    Bobbie J. Shanfelder, RDR, CRR

15    Official Court Reporter

16    Date:  June 7, 2024

17

18

19

20

21

22

23

24

25

## $

**$191** [1] - 12:21
**$547,000** [1] - 12:3
**$62** [1] - 12:21

## /

**/s** - 22:13

## 0

**0.4** [1] - 10:11
**0001** [1] - 16:15

## 1

**1** [1] - 12:19
**1,500** [1] - 19:24
**1,756** [1] - 10:10
**1.25** [2] - 12:12, 12:15
**10** [2] - 13:15, 16:18
**15** [2] - 1:7, 2:1
**17** [1] - 18:20
**1735** [1] - 1:20
**180** [1] - 18:5
**19103** [1] - 1:20
**19106** [1] - 1:7
**19428** [1] - 1:15
**1st** [1] - 9:1

## 2

**2** [8] - 12:19, 13:1,
  13:3, 13:20, 13:23,
  13:24, 14:2, 14:6
**2.9** [1] - 16:15
**20-2972** [1] - 3:13
**200** [1] - 1:15
**2024** [3] - 1:7, 2:1,
  22:16
**21** [2] - 4:2, 18:19
**23** [1] - 8:7
**23(a** [1] - 8:3
**23(e)** [2] - 2:21, 5:5
**23-CV-2288** [1] - 1:3
**29** [1] - 20:17
**2:30** [2] - 1:7, 2:1

## 3

**3** [3] - 12:19, 16:12,
  20:21
**3.3** [1] - 14:11
**30** [1] - 16:24
**300,000** [1] - 5:9
**308,000** [1] - 4:4
**38** [1] - 18:25
**390,000** [1] - 3:25
**3:01** [1] - 22:4

## 4

**40** [2] - 5:9, 19:25

## 5

**547** [1] - 12:11

## 6

**601** [1] - 1:6

## 7

**7** [1] - 22:16
**702** [2] - 12:14, 12:15
**77** [1] - 15:6

## 8

**88** [2] - 10:20, 10:21

## 9

**90** [2] - 18:23, 18:24

## A

**able** [1] - 18:14
**above-entitled** [1] -
  22:11
**absolutely** [1] - 20:1
**acknowledge** [2] -
  4:17, 13:21
**Act** [1] - 8:25
**Action** [1] - 8:25
**activate** [2] - 18:5,
  18:6
**actuality** [1] - 21:16
**add** [4] - 12:13, 12:14,
  21:3, 21:4
**address** [1] - 13:18
**addressed** [2] - 15:8,
  20:2, 21:20
**adequacy** [3] - 5:23,
  8:3, 8:5
**adequate** [1] - 2:20
**administration** [1] -
  8:11
**administrator** [2] -
  10:25, 16:12
**adopt** [1] - 13:1
**afternoon** [3] - 2:4,
  2:6, 2:11
**agreed** [2] - 12:25,
  13:6
**agreement** [12] - 4:25,
  5:4, 13:8, 13:12,
  13:15, 13:19, 13:21,
  14:8, 14:10, 14:11,
  14:17, 21:22
**agreements** [1] -
  13:17
**ahead** [2] - 2:10, 16:19
**alive** [4] - 18:20,
  18:23, 19:16
**allegations** [2] - 6:15,
  7:17
**alleged** [4] - 6:7, 6:8,
  7:9, 21:13
**allocated** [1] - 11:22
**almost** [1] - 11:5
**alone** [1] - 19:24
**amend** [1] - 14:8
**amended** [3] - 6:3,
  7:1, 21:21
**amount** [1] - 4:21
**analysis** [1] - 8:8
**Anderson** [1] - 3:12
**Angeion** [6] - 8:10,
  8:11, 8:19, 8:21,
  8:22, 15:9
**answer** [3] - 6:4,
  13:13, 14:7
**anticipate** [1] - 8:15
**anticipated** [1] - 11:18
**anyway** [1] - 10:12
**appear** [2] - 7:1, 7:12
**APPEARANCES** [1] -
  1:12
**applicable** [1] - 7:24
**apply** [1] - 7:25
**appreciate** [1] - 21:19
**approval** [2] - 2:14,
  9:11, 10:19
**approved** [3] - 4:22,
  9:5, 12:2
**argued** [1] - 5:1
**argument** [4] - 4:14,
  6:10, 6:13
**arguments** [5] - 3:8,
  20:12, 20:21, 20:22
**Article** [1] - 20:21
**ascertainability** [1] -
  5:19
**Ashlea** [1] - 6:21
**aside** [1] - 13:6
**asserting** [1] - 5:18
**assist** [1] - 7:4
**assistance** [1] - 2:24
**associated** [3] - 3:4,
  3:15, 16:16
**assuming** [2] - 3:21,
  12:2
**assumption** [2] -
  11:20, 11:21
**assumptions** [1] -
  11:20, 12:4
**attached** [1] - 17:12

**attack** [1] - 19:21
**Attorneys** [1] - 9:2
**attorneys'** [2] - 4:18,
  12:1
**authority** [1] - 9:9

## B

**backed** [1] - 4:12
**baker** [1] - 1:19
**Barr** [1] - 1:15
**based** [2] - 7:16, 11:16
**BEFORE** [1] - 1:9
**behalf** [4] - 2:2, 2:5,
  2:7, 2:12
**Ben** [3] - 2:2, 2:12,
  2:24
**benefit** [2] - 19:16,
  20:2
**BENJAMIN** [1] - 1:13
**Bernard's** [1] - 6:21
**better** [2] - 6:12, 20:20
**between** [1] - 11:22
**bidding** [1] - 8:10
**bigger** [3] - 11:5, 15:1,
  16:5
**bit** [2] - 12:5, 17:1
**bjohns@**
  **shublawyers.com**
  [1] - 1:16
**blackbaud** [1] - 3:6
**Bobbie** [3] - 1:24,
  22:13, 22:14
**Bobbie_Shanfelder**
  **@paed.uscourts.**
  **gov** [1] - 1:25
**bold** [5] - 11:5, 14:25,
  16:6, 16:7, 16:9
**bound** [1] - 16:8
**box** [2] - 12:6, 17:9
**boxes** [1] - 7:14
**BREACH** [1] - 1:4
**breach** [6] - 2:25, 3:7,
  5:19, 6:8, 19:4,
  20:23
**breached** [2] - 5:14,
  13:12
**Bridge** [1] - 1:14
**brief** [4] - 2:21, 2:23,
  3:3, 20:19
**briefed** [1] - 20:13
**broader** [1] - 3:25
**broadest** [1] - 19:10
**buckets** [1] - 11:23
**bunch** [1] - 6:4
**business** [1] - 18:21
**Byrne** [1] - 1:6

## C

**CACTUS** [1] - 19:22
**CAFA** [1] - 8:25
**calculated** [1] - 16:21
**card** [1] - 15:5
**cards** [1] - 15:7
**care** [3] - 8:20, 9:3,
  18:21
**Carolina** [3] - 3:6,
  20:4, 20:5
**case** [15] - 3:2, 3:16,
  5:3, 5:12, 7:9, 8:18,
  9:10, 9:11, 10:7,
  10:19, 11:18, 20:3,
  20:4, 20:5, 20:13
**cases** [10] - 4:22, 7:10,
  8:15, 9:7, 9:13,
  10:18, 11:17, 20:11,
  21:12, 21:15
**cash** [5] - 10:14,
  10:22, 15:13, 15:17,
  15:18
**causation** [2] - 20:9,
  20:21
**certain** [1] - 13:2
**certificates** [1] - 18:10
**certification** [6] - 3:4,
  3:6, 5:7, 5:20, 8:7,
  20:6
**certified** [1] - 7:22
**certify** [4] - 7:18, 7:20,
  17:20, 22:10
**Chambersburg** [1] -
  10:20
**change** [1] - 11:8
**check** [2] - 17:9, 19:17
**checked** [1] - 7:13
**choice** [1] - 7:23
**choice-of-law** [1] -
  7:23
**choices** [1] - 16:3
**circle** [1] - 17:15
**Circuit** [3] - 5:2, 5:3,
  5:20
**Civil** [1] - 1:3
**claim** [7] - 4:6, 4:12,
  15:10, 15:12, 17:9,
  17:10, 17:13
**claimants** [2] - 19:19,
  19:20
**claiming** [1] - 17:11
**claims** [11] - 4:6, 5:18,
  8:11, 10:17, 10:23,
  10:25, 11:21, 11:22,
  12:4, 12:20, 16:15
**class** [22] - 3:4, 3:6,
  3:16, 3:17, 3:20,
  3:25, 4:2, 4:3, 4:5,
  5:7, 5:17, 5:20, 7:4,

7:20, 7:22, 8:7, 10:8, 10:20, 10:21, 11:25, 17:21, 20:6
**Class** [1] - 8:25
**clear** [5] - 4:24, 11:12, 14:22, 15:23, 16:1
**clear-sailing** [1] - 4:24
**clearer** [2] - 9:16, 15:25
**clinics** [1] - 18:22
**colleague** [2] - 7:6, 21:15
**College** [1] - 9:11
**common** [2] - 5:15, 19:17
**commonality** [1] - 5:10
**competitive** [1] - 8:10
**complaint** [8] - 6:3, 6:12, 6:14, 6:16, 6:21, 6:22, 7:2, 7:15
**complaints** [1] - 6:25
**complete** [1] - 17:10
**complex** [1] - 21:15
**components** [1] - 11:1
**composition** [1] - 3:16
**compromised** [1] - 4:15
**concluded** [1] - 22:4
**conduct** [1] - 5:13
**confirmed** [5] - 4:4, 4:10, 9:1, 18:19, 18:24
**confused** [1] - 3:19
**confusing** [1] - 17:20
**connected** [1] - 6:11
**Connexin** [1] - 9:8
**consequence** [1] - 3:23
**Conshohocken** [1] - 1:15
**consistent** [3] - 4:21, 9:6, 21:22
**consolidated** [3] - 6:14, 6:22, 7:15
**consumer** [2] - 7:17, 20:11
**context** [1] - 7:22
**continue** [1] - 13:2
**contract** [2] - 7:24, 20:23
**core** [1] - 5:12
**correct** [4] - 4:10, 14:24, 19:15, 22:10
**correctly** [1] - 2:13
**cost** [2] - 16:16, 16:24
**counsel** [3] - 5:23, 8:6, 20:14
**course** [1] - 15:18
**COURT** [57] - 1:1, 2:8,

3:9, 3:11, 3:14, 3:19, 4:7, 4:9, 5:25, 6:14, 6:18, 6:21, 7:3, 7:15, 9:15, 9:25, 10:3, 11:4, 11:9, 12:6, 12:10, 12:16, 12:22, 12:24, 13:19, 13:23, 13:25, 14:2, 14:4, 14:10, 14:16, 14:24, 15:4, 15:12, 15:16, 15:24, 16:11, 16:18, 16:21, 16:23, 17:1, 17:15, 17:19, 18:5, 18:8, 18:15, 19:2, 19:13, 19:21, 20:1, 20:7, 20:15, 20:25, 21:3, 21:9, 21:19, 21:25
**Court** [10] - 1:25, 2:12, 2:16, 2:18, 5:6, 8:18, 8:19, 9:13, 12:9, 22:15
**Courthouse** [1] - 1:6
**Courts** [1] - 21:11
**created** [1] - 7:6
**credit** [12] - 9:23, 10:9, 10:14, 11:13, 14:13, 14:18, 14:21, 15:20, 17:4, 18:1, 18:3, 19:1
**crime** [1] - 21:8
**CRR** [2] - 1:24, 22:14
**cut** [1] - 7:1
**cyber** [4] - 19:21, 19:23, 19:25, 21:7

## D

**damages** [3] - 20:3, 20:22, 20:23
**data** [6] - 2:25, 3:7, 5:18, 13:2, 19:4, 19:7
**DATA** [1] - 1:4
**database** [1] - 19:9
**date** [2] - 13:1, 16:9
**Date** [1] - 22:16
**Daubert** [1] - 3:7
**days** [3] - 3:7, 16:18, 18:5
**dead** [4] - 18:8, 18:14, 18:19, 18:24
**dealing** [1] - 21:11
**death** [2] - 18:10, 18:11
**deceased** [6] - 3:17, 3:22, 4:2, 4:4, 4:9, 4:10
**decide** [1] - 2:18
**decided** [1] - 13:10

**declaration** [1] - 15:9
**deductions** [1] - 11:25
**Defendant** [4] - 5:14, 5:22, 8:21
**Defendant's** [1] - 5:13
**DEFENDANTS** [1] - 1:18
**Defendants** [1] - 2:7
**defense** [1] - 20:14
**defenses** [1] - 20:20
**definition** [1] - 3:20
**degree** [1] - 7:4
**denied** [1] - 3:6
**deplete** [1] - 11:3
**depositions** [1] - 7:11
**detail** [1] - 2:15
**determine** [1] - 18:8
**difference** [1] - 16:14
**different** [6] - 6:9, 9:7, 12:18, 18:18, 19:14, 19:15
**direct** [1] - 16:12
**discovery** [1] - 7:12
**discretion** [1] - 16:11
**dismiss** [2] - 20:14, 21:12
**District** [1] - 3:5
**DISTRICT** [2] - 1:1, 1:1
**divided** [1] - 19:19
**Docket** [1] - 1:3
**docket** [1] - 3:12
**document** [1] - 17:15
**documented** [11] - 10:17, 10:24, 11:2, 11:15, 14:17, 14:21, 15:20, 17:4, 17:7, 17:11, 17:16
**done** [3] - 15:19, 15:20, 18:2
**down** [1] - 17:1
**Drive** [1] - 1:15
**drug** [1] - 18:22
**during** [1] - 10:7
**duty** [2] - 5:14

## E

**easier** [1] - 12:8
**easily** [2] - 5:8, 5:20
**EASTERN** [1] - 1:1
**easy** [2] - 14:3, 17:9
**EDWARD** [1] - 1:18
**Edward** [1] - 2:6
**effective** [1] - 13:1
**elect** [1] - 15:13
**emcandrew@ bakerlaw.com** [1] - 1:21
**ended** [1] - 18:19

**entitled** [2] - 4:5, 22:11
**especially** [1] - 11:4
**ESQUIRE** [4] - 1:13, 1:13, 1:18, 1:19
**essentially** [1] - 9:7
**establish** [1] - 20:22
**establishing** [1] - 20:3
**estate** [1] - 4:11
**estimates** [1] - 12:1
**event** [2] - 5:18, 20:19
**example** [2] - 10:19, 20:23
**exceeded** [1] - 20:18
**Excel** [1] - 12:7
**except** [1] - 12:4
**exclude** [3] - 16:6, 16:8
**exhaust** [1] - 19:1
**expect** [2] - 10:15, 10:16
**expenses** [7] - 12:1, 12:6, 12:13, 12:14, 16:23, 17:1
**experience** [2] - 8:15, 11:16
**experienced** [1] - 7:9
**extent** [2] - 14:4, 15:1
**extortion** [2] - 19:23, 19:25

## F

**factors** [1] - 2:20
**facts** [1] - 21:13
**factual** [1] - 5:15
**fair** [1] - 2:19
**fairly** [1] - 13:22
**Fairness** [1] - 8:25
**fallback** [1] - 6:12
**far** [3] - 4:13, 20:6, 20:10
**Federal** [2] - 7:23, 9:2
**fees** [2] - 4:18, 12:1
**felt** [1] - 20:1
**figure** [1] - 19:7
**file** [5] - 4:12, 4:25, 6:15, 21:21
**filed** [4] - 6:2, 6:25, 11:22, 20:19
**fill** [1] - 15:10
**filled** [1] - 7:6
**final** [3] - 8:8, 9:11, 10:19
**finish** [1] - 20:16
**firm** [2] - 2:3, 8:11, 19:24
**Firm** [1] - 2:25
**first** [10] - 2:19, 6:2, 9:17, 9:22, 11:13,

14:14, 14:20, 16:4, 17:19
**flexibility** [1] - 16:17
**focus** [1] - 5:13
**folks** [3] - 7:7, 18:21, 19:16
**follow** [1] - 11:10
**font** [1] - 15:1
**FOR** [3] - 1:1, 1:13, 1:18
**foregoing** [1] - 22:10
**foremost** [1] - 2:25
**form** [11] - 14:5, 14:6, 14:9, 15:2, 15:10, 15:13, 15:24, 17:9, 17:10, 17:13
**forward** [1] - 5:24
**Four** [1] - 1:14
**framework** [1] - 9:8
**frankly** [1] - 10:2
**fraud** [4] - 6:8, 6:11, 7:9, 20:7
**fraudulent** [1] - 10:25
**free** [1] - 8:14
**FREEMAN** [1] - 1:19
**Freeman** [1] - 2:7
**front** [1] - 8:18
**fund** [8] - 9:22, 11:3, 12:17, 12:18, 15:17, 19:1, 19:17, 21:23

## G

**gangs** [1] - 19:23
**general** [3] - 2:16, 6:24, 13:22
**General** [1] - 9:2
**generally** [1] - 7:24
**Girsh** [2] - 2:20, 5:5
**given** [1] - 8:17
**grant** [1] - 5:6
**great** [3] - 2:8, 3:14, 19:17
**GROUP** [1] - 1:4
**group** [2] - 7:13, 19:22
**guess** [4] - 2:8, 4:11, 11:19, 19:4
**guys** [3] - 14:12, 17:19, 21:20

## H

**happy** [2] - 12:23, 13:18
**Harbor** [1] - 1:15
**hard** [3] - 12:5, 15:6, 16:1
**head** [1] - 14:8
**headed** [1] - 5:3
**hear** [1] - 2:9

**hearing** [1] - 22:4
**Hearing** [1] - 1:4
**hearings** [1] - 3:7
**highlighted** [1] - 12:5
**highlights** [2] - 2:17, 5:8
**highly** [3] - 11:2
**hired** [2] - 8:10, 18:9
**hit** [4] - 2:17, 5:8, 15:19, 17:24
**HOLBROOK** [4] - 1:13, 2:4, 17:7, 17:17
**Holbrook** [3] - 2:5, 7:6, 9:10
**home** [1] - 7:24
**honestly** [1] - 19:16
**Honor** [23] - 2:4, 2:6, 2:11, 2:12, 3:24, 4:10, 6:2, 6:5, 6:20, 7:2, 8:5, 9:4, 11:7, 11:19, 13:11, 15:3, 15:22, 18:4, 20:10, 21:2, 21:5, 22:2, 22:3
**Honor's** [1] - 20:18
**HONORABLE** [1] - 1:9
**Hope** [1] - 9:11
**hopefully** [1] - 8:19
**horrible** [1] - 20:1
**Hostetler** [1] - 1:19

**I**

**idea** [3] - 15:5, 16:13, 19:18
**identical** [1] - 12:4
**imminence** [1] - 21:16
**important** [2] - 5:3, 8:17
**imposed** [1] - 5:20
**impossible** [1] - 11:6
**improvements** [4] - 13:3, 13:4, 13:10
**IN** [2] - 1:1, 1:3
**inasmuch** [1] - 5:21
**include** [2] - 3:22, 16:23
**included** [3] - 4:5, 6:22, 7:16
**includes** [1] - 6:15
**including** [1] - 3:16
**indefinite** [1] - 13:15
**influence** [1] - 13:2
**information** [4] - 4:15, 8:20, 17:8, 19:9
**injuries** [3] - 21:15, 21:17
**injury** [1] - 20:8
**instance** [1] - 14:10

**instances** [2] - 19:6, 19:24
**instant** [1] - 18:12
**insurance** [1] - 14:14
**interested** [1] - 9:13
**interesting** [2] - 18:15, 21:6
**interviewed** [1] - 6:4
**involved** [3] - 7:10, 14:19, 19:8
**involves** [1] - 11:20
**issue** [5] - 5:6, 5:19, 8:8, 20:9, 21:5
**issued** [1] - 3:5
**issues** [6] - 2:18, 3:18, 5:12, 20:10, 21:11, 21:14
**italicized** [1] - 14:25

**J**

**James** [1] - 1:6
**Jersey** [1] - 7:16
**JOHNS** [48] - 1:13, 2:2, 2:11, 3:10, 3:12, 3:15, 3:24, 4:8, 4:10, 6:1, 6:17, 6:20, 6:23, 7:5, 7:19, 9:24, 10:2, 10:5, 11:7, 11:18, 12:7, 12:12, 12:17, 12:23, 13:5, 13:20, 13:24, 14:1, 14:3, 14:7, 14:15, 14:23, 15:3, 15:8, 15:15, 15:22, 16:10, 16:13, 16:20, 16:22, 16:25, 18:6, 20:5, 20:9, 20:16, 21:2, 21:24, 22:2
**Johns** [5] - 1:14, 2:2, 2:3, 2:5, 2:12
**Joseph** [1] - 3:12
**Jr** [1] - 3:12
**Judge** [8] - 3:9, 3:10, 3:12, 4:13, 6:17, 9:8, 13:5, 13:20
**judgment** [1] - 6:10
**June** [1] - 22:16

**K**

**KAREN** [1] - 1:9
**keep** [2] - 13:4, 18:25
**Keystone** [1] - 10:18
**Kroll** [1] - 18:9

**L**

**lack** [1] - 6:12
**large** [1] - 3:16

**last** [2] - 10:20, 19:24
**law** [2] - 2:3, 7:23
**Law** [1] - 2:24
**laws** [2] - 7:17, 7:25
**lawyer** [1] - 7:8
**lawyers** [1] - 8:16
**lead** [2] - 8:6, 17:3
**learned** [1] - 10:7
**least** [2] - 9:21, 16:14
**left** [3] - 11:14, 11:15, 19:19
**legal** [1] - 5:15
**legally** [1] - 16:8
**less** [2] - 10:11, 16:12
**letters** [1] - 18:13
**level** [1] - 7:4
**liability** [1] - 20:3
**likelihood** [1] - 7:11
**likely** [4] - 9:21, 18:22, 18:24, 19:1
**limits** [1] - 20:19
**line** [2] - 11:25, 12:14
**link** [1] - 14:13
**list** [2] - 5:21, 9:12
**litigate** [1] - 4:17
**litigation** [1] - 7:22
**LITIGATION** [1] - 1:4
**LLC** [2] - 1:4, 1:14
**LLP** [1] - 1:19
**long-term** [1] - 18:21
**look** [4] - 5:10, 12:8, 15:12, 20:13
**looking** [1] - 15:5
**looks** [1] - 9:18
**loss** [4] - 10:17, 14:17, 14:21, 17:16
**losses** [7] - 10:24, 11:2, 11:15, 15:20, 17:4, 17:7, 17:11
**low** [3] - 10:10, 10:15, 10:17

**M**

**mail** [3] - 15:5, 17:2, 17:13
**mailing** [1] - 18:12
**maintains** [1] - 5:22
**March** [1] - 9:1
**Mark** [1] - 6:18
**Market** [2] - 1:6, 1:20
**Marston** [1] - 13:6
**MARSTON** [1] - 1:9
**match** [1] - 6:23
**matter** [3] - 6:24, 11:19, 22:11
**McAndrew** [5] - 2:7, 4:14, 4:25, 6:9, 20:20
**MS** [3] - 2:4, 17:7,

**MCANDREW** [13] - 1:18, 2:6, 13:18, 18:3, 18:7, 18:9, 18:17, 19:6, 19:15, 19:22, 21:5, 21:10, 22:3
**mean** [2] - 14:15, 15:6
**measures** [1] - 8:19
**mediation** [3] - 10:8, 20:17
**mediator** [1] - 2:24
**mediators** [1] - 2:25
**meets** [1] - 5:4
**members** [5] - 4:4, 5:17, 10:8, 10:21, 17:21
**mention** [2] - 4:13, 9:6
**mentioned** [2] - 10:18, 21:15
**met** [2] - 5:8, 5:20
**methadone** [1] - 18:22
**Michigan** [1] - 9:10
**might** [3] - 14:5, 16:3, 17:1
**million** [1] - 12:12
**mind** [2] - 16:14, 18:25
**mine** [1] - 19:7
**money** [4] - 11:13, 11:14, 11:15, 19:18
**monitoring** [12] - 9:23, 10:9, 10:14, 11:2, 11:13, 14:13, 14:21, 15:21, 17:4, 18:1, 18:3, 19:1
**most** [1] - 9:19
**motion** [5] - 2:9, 2:14, 2:15, 20:13
**motions** [1] - 21:12
**move** [1] - 8:8
**MR** [59] - 2:2, 2:6, 2:11, 3:10, 3:12, 3:15, 3:24, 4:8, 4:10, 6:1, 6:17, 6:20, 6:23, 7:5, 7:19, 9:24, 10:2, 10:5, 11:7, 11:18, 12:7, 12:12, 12:17, 12:23, 13:5, 13:18, 13:20, 13:24, 14:1, 14:3, 14:7, 14:15, 14:23, 15:3, 15:8, 15:15, 15:22, 16:10, 16:13, 16:20, 16:22, 16:25, 18:3, 18:6, 18:7, 18:9, 19:6, 19:15, 19:22, 20:5, 20:9, 20:16, 21:2, 21:5, 21:10, 21:24, 22:2, 22:3

**last** ...

**multiple** [1] - 6:7
**must** [3] - 16:6, 16:8

**N**

**name** [1] - 3:10
**names** [1] - 6:23
**NATHALIE** [1] - 1:19
**Nathalie** [1] - 2:7
**nationally** [1] - 8:11
**nationally-reputable** [1] - 8:11
**nationwide** [2] - 7:20, 7:22
**natural** [1] - 3:21
**nature** [2] - 5:15, 8:18
**need** [1] - 14:11
**needed** [1] - 15:1
**needs** [3] - 9:16, 11:12, 14:22
**negotiated** [3] - 2:23, 13:7
**net** [5] - 9:22, 11:11, 12:17, 12:18, 21:23
**New** [1] - 7:16
**next** [4] - 9:10, 9:20, 16:4, 16:5
**nfreeman@bakerlaw.com** [1] - 1:21
**nice** [1] - 12:8
**none** [1] - 14:18
**note** [6] - 3:3, 4:23, 8:17, 8:24, 10:23, 12:24
**noted** [1] - 2:13
**notice** [19] - 3:21, 4:1, 5:21, 8:9, 8:13, 8:24, 8:25, 9:16, 9:18, 10:8, 11:4, 14:5, 14:9, 14:24, 15:4, 17:20, 21:21
**noticed** [1] - 10:4
**notices** [1] - 18:11
**notification** [1] - 18:12
**notified** [2] - 19:9, 19:10
**notify** [2] - 19:8, 19:11
**number** [13] - 4:3, 4:20, 6:1, 8:14, 10:6, 10:13, 10:16, 11:20, 18:9, 18:13, 18:24, 19:4, 19:5
**Number** [1] - 3:13
**numbers** [2] - 9:7, 12:10
**numerosity** [1] - 5:8
**nursing** [1] - 18:21

17:17

## O

**objection** [1] - 4:25
**obviously** [5] - 4:16, 4:18, 12:1, 16:15, 21:13
**OF** [1] - 1:1
**offered** [1] - 10:9
**office** [1] - 18:17
**Official** [2] - 1:25, 22:15
**officials** [1] - 9:2
**old** [1] - 18:23
**once** [1] - 12:2
**one** [21] - 2:25, 3:3, 4:19, 4:20, 6:1, 6:5, 7:3, 8:24, 9:6, 10:6, 10:7, 11:9, 11:20, 12:18, 12:19, 15:7, 15:12, 19:23, 21:6
**one-third** [1] - 4:20
**Onix** [6] - 2:7, 10:8, 13:1, 15:12, 18:1, 19:17
**ONIX** [1] - 1:4
**open** [1] - 15:7
**opinion** [3] - 3:5, 3:10, 9:8
**opposed** [1] - 10:14
**opted** [1] - 18:2
**or"s** [3] - 14:19, 14:25, 16:5
**order** [4] - 11:10, 14:12, 14:25
**ordering** [1] - 14:15
**organizations** [1] - 21:8
**original** [2] - 18:3, 19:5
**otherwise** [1] - 14:16
**ought** [1] - 11:12
**ourselves** [1] - 16:17
**overall** [1] - 11:21
**overview** [1] - 2:16
**own** [1] - 18:11

## P

**p.m** [3] - 1:7, 2:1, 22:4
**PA** [3] - 1:7, 1:15, 1:20
**page** [7] - 15:25, 16:4, 16:5, 17:20, 17:24, 20:19
**Page** [1] - 15:6
**pages** [2] - 15:8, 20:17
**paid** [1] - 11:10
**paralegal** [1] - 7:8
**part** [1] - 12:25
**participate** [1] - 7:12
**particular** [1] - 10:7

**particularly** [1] - 8:17
**parties** [1] - 12:25
**patient** [1] - 19:9
**pay** [1] - 19:19
**payment** [6] - 9:19, 9:20, 9:21, 15:13, 15:17, 15:18
**pdf** [1] - 15:6
**pending** [1] - 2:14
**Pennsylvania** [1] - 7:16
**PENNSYLVANIA** [1] - 1:1
**people** [18] - 3:17, 3:25, 4:4, 4:9, 5:9, 6:3, 6:7, 6:8, 6:13, 7:13, 9:19, 9:21, 10:10, 10:14, 10:16, 15:10, 16:2, 18:15
**percent** [14] - 4:2, 10:11, 10:20, 10:21, 12:19, 16:12, 16:15, 18:19, 18:20, 18:25, 19:25
**period** [1] - 13:1
**person** [5] - 3:21, 3:22, 6:19, 11:17, 18:13
**personal** [1] - 19:7
**perspective** [1] - 5:13
**Philadelphia** [3] - 1:7, 1:20, 3:1
**phrase** [1] - 6:12
**Picker** [1] - 2:24
**place** [2] - 8:20, 13:4
**Plaintiff** [1] - 6:15
**Plaintiffs** [8] - 2:2, 2:5, 2:13, 5:17, 5:23, 6:11, 6:25, 8:4
**PLAINTIFFS** [1] - 1:13
**plan** [1] - 8:9
**plausibly** [1] - 21:13
**played** [1] - 7:21
**pleading** [1] - 21:12
**pled** [1] - 21:13
**point** [7] - 4:19, 4:20, 4:23, 8:24, 9:14, 10:12, 11:1
**pointed** [1] - 2:23
**points** [1] - 2:21
**portion** [1] - 3:17
**possible** [1] - 19:10
**post** [1] - 18:17
**postage** [1] - 15:10
**postcard** [2] - 11:5, 17:14
**potentially** [1] - 11:17
**practical** [1] - 13:14
**predominance** [1] - 5:10

**preliminarily** [1] - 9:5
**preliminary** [2] - 2:14, 11:19
**prepaid** [1] - 15:10
**prepared** [1] - 2:14
**pretty** [2] - 13:16, 13:20
**print** [1] - 17:13
**privacy** [1] - 13:2
**pro** [4] - 11:16, 15:13, 15:17, 17:21
**pro-rata** [4] - 11:16, 15:13, 15:17, 17:21
**proceedings** [1] - 22:11
**process** [2] - 8:10, 18:12
**proof** [3] - 17:12, 17:18, 21:8
**proposed** [2] - 2:19, 8:12
**protection** [2] - 7:17, 20:12
**provide** [1] - 17:8
**provision** [2] - 4:24, 7:23
**public** [2] - 17:22, 18:10
**publicly** [1] - 18:11
**purposes** [3] - 5:7, 7:20, 19:10
**put** [4] - 8:18, 9:9, 14:12, 15:23

## Q

**questionnaire** [1] - 7:6
**questions** [10] - 2:10, 5:16, 6:4, 7:8, 7:10, 8:7, 9:14, 9:15, 19:3, 21:20
**quickly** [1] - 15:11

## R

**raised** [1] - 3:17
**ransomware** [1] - 19:22
**rata** [4] - 11:16, 15:13, 15:17, 17:21
**rate** [4] - 10:9, 11:21, 12:4, 12:20
**RDR** [2] - 1:24, 22:14
**RE** [1] - 1:3
**Re** [1] - 3:6
**read** [13] - 9:20, 11:6, 12:5, 12:8, 14:16, 14:19, 14:20, 15:20, 16:1, 16:3, 17:2,

17:5, 17:24
**realize** [4] - 14:19, 15:19, 15:21, 17:25
**really** [7] - 2:17, 5:12, 7:24, 9:16, 13:13, 14:18, 17:22
**reason** [6] - 6:9, 8:21, 10:5, 10:13, 13:6, 13:14
**reasonable** [2] - 2:20, 21:10
**reasons** [2] - 6:1, 9:4
**receive** [1] - 15:18
**received** [1] - 18:13
**recognize** [1] - 20:13
**record** [4] - 8:12, 8:22, 9:9, 22:11
**records** [1] - 18:10
**referenced** [1] - 20:4
**rehab** [1] - 18:22
**reimbursement** [1] - 17:11
**related** [1] - 8:24
**released** [1] - 7:21
**releasing** [1] - 4:6
**renoticing** [1] - 16:16
**repeat** [1] - 2:21
**Reporter** [2] - 1:25, 22:15
**representative** [1] - 7:4
**representatives** [2] - 6:6, 8:2
**reputable** [1] - 8:11
**requesting** [1] - 4:21
**required** [1] - 17:12
**requirement** [2] - 8:3, 17:12
**respect** [4] - 2:15, 4:18, 8:4, 8:6
**respectfully** [2] - 8:5, 9:4
**respond** [1] - 5:1
**response** [1] - 10:9
**rest** [1] - 9:14
**result** [1] - 6:8
**return** [1] - 15:9
**review** [1] - 10:25
**risk** [4] - 4:13, 4:17, 20:3
**risks** [5] - 3:2, 3:3, 3:4, 3:15, 20:6
**Ronon** [1] - 2:24
**Rule** [4] - 2:20, 5:5, 8:3, 8:7

## S

**sailing** [1] - 4:24
**Samantha** [1] - 2:4

**SAMANTHA** [1] - 1:13
**satisfied** [2] - 8:3, 8:6
**satisfy** [1] - 8:19
**scenarios** [1] - 12:18
**second** [2] - 5:6, 11:21
**Section** [1] - 13:20
**security** [3] - 8:19, 13:2, 21:7
**see** [6] - 3:11, 10:24, 12:20, 12:22, 15:22, 20:11
**seeking** [3] - 7:18, 7:19, 7:20
**selected** [1] - 7:13
**send** [3] - 15:11, 16:18
**sending** [1] - 5:21
**sense** [4] - 12:24, 13:14, 14:18, 15:17
**sent** [2] - 9:1, 10:8
**settled** [1] - 4:3
**Settlement** [1] - 1:4
**settlement** [30] - 2:19, 2:22, 4:24, 5:4, 5:7, 7:19, 8:13, 9:5, 9:22, 10:13, 11:11, 12:25, 13:8, 13:12, 13:14, 13:17, 13:19, 13:21, 14:8, 14:10, 14:11, 14:16, 15:12, 15:18, 16:8, 16:12, 19:11, 21:22, 21:23
**seven** [3] - 5:23, 7:13, 8:4
**Shanfelder** [3] - 1:24, 22:13, 22:14
**sholbrook@ shublawyers.com** [1] - 1:16
**short** [2] - 13:13, 15:4
**show** [1] - 20:7
**shub** [1] - 1:14
**Shub** [2] - 2:3, 2:5
**sign** [2] - 15:23, 17:25
**signals** [1] - 15:23
**significant** [1] - 3:2
**single** [2] - 7:7, 20:18
**situated** [1] - 20:20
**size** [2] - 11:25, 15:1
**small** [2] - 11:4, 16:2
**sole** [1] - 16:11
**someone** [1] - 6:10
**somewhere** [1] - 17:5
**sort** [2] - 2:17, 10:5, 11:9
**South** [3] - 3:5, 20:4, 20:5
**space** [1] - 20:18
**SPENCER** [1] - 1:9
**stage** [1] - 21:12

**standard** [5] - 5:4, 5:9, 13:16, 21:7
**standing** [1] - 20:10
**start** [2] - 11:12, 12:12
**starts** [1] - 14:13
**state** [2] - 7:17, 7:25
**statement** [1] - 20:17
**states** [2] - 6:6, 8:2
**States** [1] - 3:1
**STATES** [1] - 1:1
**statute** [1] - 7:23
**statutes** [1] - 20:12
**stepped** [1] - 5:24
**still** [2] - 18:20, 18:23
**stop** [2] - 13:10, 15:23
**Stradley** [1] - 2:24
**Street** [2] - 1:6, 1:20
**structure** [3] - 9:7, 9:12, 10:21
**structured** [1] - 10:13
**stuff** [1] - 3:21
**subclasses** [2] - 7:16, 7:18
**submission** [1] - 8:23
**submit** [5] - 8:3, 8:5, 9:5, 10:16, 17:17
**substantiating** [1] - 17:17
**subtract** [2] - 12:10, 12:15
**summary** [1] - 6:10
**summer** [1] - 10:20
**supplemental** [1] - 9:9
**systems** [1] - 21:8

## T

**talks** [2] - 3:20, 15:16
**tally** [1] - 19:8
**tear** [1] - 15:9
**tear-off** [1] - 15:9
**term** [5] - 3:23, 13:7, 18:21
**thankfully** [1] - 20:15
**THE** [61] - 1:1, 1:1, 1:9, 1:13, 1:18, 2:8, 3:9, 3:11, 3:14, 3:19, 4:7, 4:9, 5:25, 6:14, 6:18, 6:21, 7:3, 7:15, 9:15, 9:25, 10:3, 11:4, 11:9, 12:6, 12:10, 12:16, 12:22, 12:24, 13:19, 13:23, 13:25, 14:2, 14:4, 14:10, 14:16, 14:24, 15:4, 15:12, 15:16, 15:24, 16:11, 16:18, 16:21, 16:23, 17:1, 17:15, 17:19, 18:5, 18:8, 18:15, 19:2,

19:13, 19:21, 20:1, 20:7, 20:15, 20:25, 21:3, 21:9, 21:19, 21:25
**theoretically** [3] - 4:11, 4:12, 13:9
**third** [2] - 4:20, 8:8
**Third** [3] - 5:2, 5:19
**thoroughly** [1] - 6:3
**three** [9] - 2:17, 3:7, 8:2, 11:11, 11:22, 12:3, 12:18, 16:3, 20:10
**throw** [1] - 17:2
**timely** [1] - 17:2
**today** [1] - 4:19
**together** [1] - 5:11
**toll** [1] - 8:14
**toll-free** [1] - 8:14
**took** [2] - 18:15, 19:9
**top** [5] - 11:24, 11:25, 12:14, 14:7, 14:21
**total** [1] - 12:6
**totally** [1] - 3:20
**tough** [1] - 7:24
**Tower** [1] - 1:14
**transcript** [1] - 22:10
**translates** [1] - 10:11
**transmitted** [1] - 8:21
**trial** [1] - 19:13
**true** [1] - 21:13
**turns** [1] - 4:1
**two** [7] - 4:20, 9:20, 10:6, 11:1, 11:20, 15:8, 17:23
**types** [2] - 5:18, 13:16
**typicality** [1] - 5:17
**typically** [1] - 5:9

## U

**U.S** [1] - 1:6
**ultimately** [1] - 7:13
**uncertain** [1] - 21:16
**uncharted** [1] - 21:11
**under** [4] - 2:20, 5:5, 20:11
**understood** [3] - 11:7, 15:3, 21:24
**UNITED** [1] - 1:1
**United** [1] - 3:1
**unless** [2] - 8:6, 9:13
**unlikely** [1] - 11:3
**unopposed** [2] - 2:9, 2:13
**up** [9] - 4:3, 5:2, 6:23, 12:14, 14:13, 16:11, 18:19, 19:8, 19:19
**update** [1] - 21:22
**upwards** [1] - 19:25

## V

**valuation** [1] - 21:17
**various** [3] - 9:1, 20:12, 20:21
**verdict** [1] - 15:24
**versus** [1] - 16:15
**vetted** [2] - 6:3, 6:18
**view** [1] - 21:16
**viewed** [1] - 4:16
**Virginia** [1] - 7:16
**visualize** [1] - 15:7

## W

**walk** [1] - 12:23
**ways** [2] - 18:9, 18:18
**website** [5] - 8:13, 17:3, 17:5, 17:6, 17:10
**Wednesday** [1] - 2:1
**week** [1] - 9:11
**Wolson's** [1] - 9:8
**works** [2] - 9:17, 11:24
**worth** [1] - 3:7
**writing** [1] - 19:17

## Y

**year** [5] - 10:9, 13:11, 18:6, 18:7, 19:24
**years** [8] - 13:1, 13:3, 13:15, 13:23, 13:24, 14:2, 14:6, 18:23
**yesterday** [1] - 3:5
**yourself** [3] - 16:6, 16:7, 16:8